

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed December 8, 2021

_____
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **John Corbitt,** | § | **Case No. 20-32083** |
| | § | |
| Debtor. | § | |
| | § | |
| **Kristy Scarborough,** | § | |
|   d/b/a CrossFit Crandall | § | |
| | § | |
| Plaintiff, | § | |
| | § | **Adv. No. 20-03130-hdh** |
| v. | § | |
| | § | |
| **John Corbitt,** | § | |
| | § | |
| Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On October 20, 2020, Kristy Scarborough, d/b/a CrossFit Crandall (the "Plaintiff") filed a complaint[1] initiating the above-captioned adversary proceeding against John Corbitt (the

---

[1] *Plaintiff's Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. §523(a)(2)* [Docket No. 1] (the "Complaint").

"Defendant"). The Plaintiff, who owns and operates CrossFit Crandall, entered into a contract[2] with the Defendant's construction company to create a workout facility located in Crandall, Texas. The Plaintiff generally alleges that the Defendant made false statements relating to (i) his qualifications to build the CrossFit facility and (ii) the project's status and whether construction materials had been purchased. The Plaintiff seeks a determination that her claim against the Defendant is nondischargeable pursuant to Bankruptcy Code section 523(a)(2)(A). For the reasons set forth in greater detail below, the Court finds and concludes that in this case, the Plaintiff has not satisfied her burden to except her debt from discharge under section 523(a)(2)(A).

## I. Jurisdiction and Venue

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This adversary proceeding involves a core matter under 28 U.S.C. § 157(b)(2)(I). Venue for this adversary proceeding is proper pursuant to 28 U.S.C. § 1409(a). The following are the Court's Findings of Fact and Conclusions of Law, issued pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7052.[3]

## II. Procedural History

On February 17, 2021, the Defendant filed an amended answer to the Complaint and asserted a counterclaim for post-petition attorneys' fees based on the written Contract between the Plaintiff and the Defendant.[4] On September 28, 2021, the Court entered the *Joint Final Pre-Trial Order* [Docket No. 61] (the "Joint Pretrial Order"). The only claim asserted by either party in the Joint Pretrial Order is the Plaintiff's claim under section 523(a)(2)(A). The Defendant's

---

[2] Defendant's Exhibit C (the "Contract").

[3] Any Finding of Fact more properly construed as a Conclusion of Law shall be considered as such, and *vice versa*.

[4] *Defendant's First Amended Answer and Counterclaim* [Docket No. 18].

counterclaim for attorneys' fees was not asserted in the Joint Pretrial Order and has therefore been abandoned. *McGehee v. Certainteed Corp.*, 101 F.3d 1078, 1080 (5th Cir. 1996) ("It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial.").

The Court held a trial on this matter from October 12, 2021 through October 14, 2021 and took the matter under advisement.

### III. Findings of Fact

#### A. The Parties

In 2014, the Plaintiff began to operate a business known as CrossFit Crandall as its sole proprietor. The Plaintiff initially began operations by opening a workout facility in a strip mall in Crandall, Texas.

The Defendant has experience with a wide variety of construction-related jobs, from piping and welding to being a project manager from 2004 to 2014 for CSA Concrete ("CSA"), a major concrete developer in the Dallas/Fort Worth metroplex. While at CSA, the Defendant held a variety of positions, including purchasing agent, project superintendent, and operations manager. Kevin Court, the owner and operator of CSA, testified credibly as to the significant experience the Defendant gained with construction and project management while at CSA. After leaving CSA in 2014, the Defendant and his wife started Double C Construction and Ranch ("Double C"). The Defendant worked for Double C as a general contractor doing concrete and metal work, fencing, wood decks, general remodeling, and other related work.

#### B. The Introduction of the Defendant to the Plaintiff

In 2015, the Plaintiff sought to expand her operations through the construction of a standalone workout facility on a plot of land located at 207 Ledbetter in Crandall (the "New

CrossFit Facility"). Throughout this expansion phase, the Plaintiff was assisted by her husband (then-boyfriend) Brad Shook. The Plaintiff testified that Mr. Shook was her "right-hand man" and her "foreman" throughout this time. Additionally, the Plaintiff relied on Mr. Shook to make recommendations on whom she should hire as a builder. Mr. Shook recommended the Defendant as a potential builder for the New CrossFit Facility. Mr. Shook testified that he was a long-time friend of the Defendant's wife and family and knew of the Defendant's previous work experience at a concrete company. Also, the Defendant had poured concrete for Mr. Shook on a previous job and the two had an ongoing business relationship.

In July 2015, the Plaintiff approached the Defendant about building the New CrossFit Facility, which would involve pouring concrete and constructing a steel frame to be used as a CrossFit gym. Ultimately, the Plaintiff sought to erect a simple shell of a building. The New CrossFit Facility would have a foundation, a metal roof, and several doors and windows. As the Plaintiff and Defendant continued to meet and discuss the project, the Defendant sketched several drawings[5] that underwent revisions.

On or around August 19, 2015, the Defendant provided the Plaintiff a breakdown of estimated costs and a bid to build the New CrossFit Facility for approximately $160,000.[6] By this point, the Plaintiff had received two other substantially lower bids for the project, and communicated to the Defendant her desire to, from a cost perspective, scale down the project from his original estimates. In response, the Defendant provided a revised bid that was much lower and covered a more limited scope of work. Mr. Shook testified that ultimately the competing bids were a little too high, and that he recommended hiring the Defendant based on the Defendant's

---

[5] Defendant's Exhibit A.

[6] Defendant's Exhibit B.

lower price and his long-time friendship with the Defendant. The Plaintiff testified that she accepted the Defendant's bid because of the existing friendship, the fact that his bid was lower than the others, and because of representations the Defendant made about his experience and abilities. On cross-examination, the Plaintiff could not recall specific statements made by the Defendant about his experience and abilities other than that he could do the job and that he did this type of work for a living.

### C. The Construction Contract

On January 13, 2016, the Plaintiff, relying on both the recommendation of Mr. Shook and her communications with the Defendant, entered into the Contract with Double C. The Contract provided for the construction of a 24' x 50' building in which CrossFit Crandall could operate. As previously stated, the understanding between the parties was that the New CrossFit Facility itself would be rather simple: the proposal called for a concrete foundation, metal framing, rolling doors and single- and double-walk doors, windows, and associated labor costs. The estimated total cost for the project in the Building Proposal attached to the Contract was $52,400, but the Contract provided that the Plaintiff would be responsible for any additional costs resulting from agreed-upon changes.

Per the terms of the Contract and the estimated budget contained in the Building Proposal,[7] the Plaintiff paid a $23,000 down payment. Following this initial payment, the Defendant hired an engineer to create drawings of the structure[8] so that the City of Crandall would issue a building permit. On June 6, 2016, the City of Crandall issued the building permit,[9] which allowed construction to begin.

---

[7] Plaintiff's Exhibit 3.
[8] Defendant's Exhibit D.
[9] Defendant's Exhibit E.

### D. The Termination of the Business Relationship

By July 2016, the Defendant had poured and finished the foundation for the New CrossFit Facility. Following frequent rains, the Defendant began construction of the structure in mid- to late July. On July 19, 2016, the Defendant provided the Plaintiff with a revised estimate[10] showing an updated breakdown of expenses now totaling $56,400. The Defendant testified that the cost increase was attributable to concrete costs and the engineering services necessary to obtain the building permit. On July 29, 2016, the Plaintiff wrote a check to the Defendant in the amount of $15,000.[11]

The Defendant testified that he asked the Plaintiff for a draw amount of $8,000 in August because he was running out of funds from the previous amounts paid and needed to catch up on expenses for materials and labor. On August 25, 2016, the Defendant provided an invoice listing an amount owed of $18,400, representing the difference between the payments received ($38,000) and the revised contract price ($56,400).[12] On August 29, 2016, the Plaintiff wrote a check for $4,000, which brought her total amount paid to $42,000.[13] At this time, the Defendant had fully completed the concrete and had neared completion of the erection of the "High Ridge" metal framing. However, the windows and doors had yet to be installed, and the roof was not complete.

On September 6, 2016, the Defendant stopped working on the project.[14] Subsequently, the Plaintiff communicated to the Defendant that she expected a refund for the difference between the

---

[10] Defendant's Exhibit G.

[11] Plaintiff's Exhibit 9.

[12] Plaintiff's Exhibit 6.

[13] Plaintiff's Exhibit 10.

[14] The Defendant stopped work on the project because of issues between the parties that were discussed at trial. The parties disagree as to whether the Contract was breached and, if so, which party breached, but the specifics of that dispute are not relevant to the Court's determination in this case under section 523(a)(2)(A).

amount she had paid by that point ($42,000) and her calculation of the amount the Defendant should have spent on labor and materials ($29,890) based on line items in the estimates.[15]

Mrs. Marlo Corbitt, the Defendant's wife, testified credibly that she is the owner and sole proprietor of Double C. She further testified that she handles all invoicing and payment of expenses on behalf of Double C. Specifically, she testified that some vendors, such as the laborers, were paid in cash while other vendors were paid directly from the bank account. Mrs. Corbitt testified further that between April 2016 and September 2016, Double C spent more than $50,000 on project costs associated with the New CrossFit Facility.

Following the termination of the business relationship between the Plaintiff and the Defendant, the Plaintiff hired new contractors to complete the construction of the New CrossFit Facility. The Plaintiff testified that the total cost of construction was roughly $17,000 more than the updated Contract estimate of $56,400.

## IV. Conclusions of Law

As previously stated, the Plaintiff seeks to except her claim from the Defendant's discharge under section 523(a)(2)(A). Exceptions to discharge must be strictly construed against the creditor and liberally construed in favor of the debtor. *See FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011). The party promoting the exception to discharge must prove by a preponderance of the evidence that the debt is nondischargeable. *Id.* (citing *Grogan v. Garner*, 498 U.S. 279 (1991)).

To obtain relief under section 523(a)(2)(A), the Plaintiff must show that the Defendant owes the Plaintiff a debt "for money, property, services, or an extension, renewal, or refinancing of credit" that was "obtained by false pretenses, a false representation, or actual fraud." The Fifth

---

[15] Plaintiff's Exhibit 12.

Circuit has distinguished the elements of "false pretenses and false representations" from "actual fraud." False representations and false pretenses within the meaning of section 523(a)(2)(A) require that the creditor prove (1) the existence of a knowing and fraudulent falsehood, (2) describing past or current facts, (3) that was relied upon by the creditor. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292-93 (5th Cir. 1995).

By contrast, a cause of action for actual fraud under section 523(a)(2)(A) exists when a debtor makes a promise of future action which, at the time it was made, he had no intention of fulfilling. *Bercier v. Bank of Louisiana (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991). The creditor must prove that (1) the debtor made a representation; (2) the debtor knew that the representation was false at the time it was made; (3) the debtor made the representation with the intent and purpose to deceive the creditor; (4) the creditor relied on the representation; and (5) the creditor sustained a loss as the proximate result of its reliance on the representation. *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 398 (5th Cir. 2017).

In the Joint Pretrial Order and at trial, the Plaintiff alleged that the Defendant made false statements and representations relating to (i) his qualifications to construct the New CrossFit Facility and (ii) the project's ongoing status and whether construction materials had been purchased. The Court will address the two subsets of alleged representations in turn.

### A. Representations Regarding the Defendant's Qualifications

The Plaintiff alleges the Defendant made misrepresentations regarding his abilities and experience and that the Plaintiff relied on those representations in entering into the Contract. Specifically, the Plaintiff testified that the Defendant told her he "could get the job done" and that he did this type of work for a living. Further, the Plaintiff alleges that the Defendant made similar representations to Mr. Shook. In support of her allegation that the Defendant's representations

that he was qualified to complete her project were false, the Plaintiff presented evidence of several issues with the construction of the New CrossFit Facility that the Plaintiff discovered after the Defendant stopped work.

In order to succeed under section 523(a)(2)(A), under either an actual fraud or a false pretenses/false representations analysis, the Plaintiff must prove that the Defendant's representations regarding his abilities and experience were false and that the Defendant knew they were false. The Plaintiff must also show that she relied on the Defendant's representations when she chose to contract with him.

As an initial matter, the Defendant's representations regarding his abilities and experience do not appear to be false. Mr. Court testified credibly as to the wide range of construction experience the Defendant gained while at CSA. The Defendant had not only overseen concrete pouring jobs, but had also served as a general contractor dealing with subcontractors in various areas of construction. Furthermore, the Defendant offered credible testimony as to his significant construction experience prior to working for CSA. While there were problems with the construction, the evidence does not support a finding that they were severe or pervasive enough to suggest the Defendant's statements regarding his abilities and experience were false.

Even if the Defendant had made false representations regarding his abilities and experience, the Plaintiff did not show that she relied on them when entering into the Contract. Rather, the evidence suggests that the Plaintiff relied upon Mr. Shook's recommendation in approaching the Defendant in the first place, and Mr. Shook testified that he made his recommendation based upon his friendship and prior work experience with the Defendant.

To the extent the Defendant made representations regarding his abilities and experience, the Plaintiff has not proven they were false, much less that the Defendant knew the statements

were false when he made them. The Plaintiff has also failed to prove that she relied on the Defendant's representations regarding his abilities or experience when entering into the Contract.

### B. Representations Regarding Project Status and the Purchase of Materials

The Plaintiff also alleges that the Defendant made false representations regarding the project's status and whether certain materials had been purchased. The Plaintiff claims these representations were made in billing invoices, estimates, and other statements made by the Defendant.

The Plaintiff claims that by the time the Defendant stopped work, despite having been paid $42,000, the Defendant had only purchased the metal framing, concrete, and plans, which were estimated in the Contract to cost a total of $29,890. Because of this, the Plaintiff believes she paid for materials and labor that were not provided, and the Defendant effectively walked away with more than $10,000. The Plaintiff testified that she had to pay more than $30,000 to hire new contractors not only to finish the project but to fix the Defendant's prior work.

There are a few problems with the Plaintiff's claim based on the Defendant's representations regarding the project's status and whether certain materials had been purchased. The first problem is that it is not clear that the Defendant made the representations that the Plaintiff claims. The cost estimates and invoices, for instance, did not actually contain an affirmative representation regarding how all of the Plaintiff's money had been used or would be used. An estimate is, by definition, an uncertain statement of how much money would be spent on certain line items, and the evidence did not show that—at the time the estimates were provided—the Defendant did not intend to use the Plaintiff's funds to pay for materials and labor called for by the Contract. Rather, the evidence at trial showed that this project had legitimate unexpected expenses. When asked during cross-examination about what representations the Defendant ever

made regarding what materials had been purchased, the Plaintiff testified that the Defendant only ever told her the money had been spent, not what it had been spent on.

Even to the extent the Defendant did make representations about what materials had been purchased or would be purchased with new funds, those representations were generally not false, and the Plaintiff has certainly not shown that any of them were knowingly false. Mrs. Corbitt testified credibly that Double C's expenses on this construction project exceeded $50,000 and that Double C paid those expenses during construction. Those payments included cash payments for labor and dirt work, along with payments for other necessary expenses.

Because the Plaintiff has not shown that the Defendant made representations regarding the purchase of materials or the status of the project that were false, much less knowingly false, they cannot form the basis of relief under section 523(a)(2)(A).

## V. Conclusion

The Plaintiff frames this case as one of fraud, false pretenses, and false representations, but the case appears to be more similar to a common breach of contract action. The Plaintiff has failed to show by a preponderance of the evidence that the Defendant owes the Plaintiff a debt for money that was obtained by false pretenses, a false representation, or actual fraud. For these reasons, judgment will be entered in favor of the Defendant.

### End of Findings and Conclusions ###